UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JACKIE C. ROWE, MARY ROWE, KENNY J. WERDEHAUSEN, and ANITA WERDEHAUSEN,<br><br>　　　Plaintiffs,<br><br>　　vs.<br><br>BENICORP INSURANCE COMPANY,<br><br>　　　Defendant. | Case No. 2:04-cv-00022 SNL |

## **MEMORANDUM**

Plaintiffs Jackie and Mary Rowe (the Rowes) filed suit against Defendant Benicorp Insurance Company, under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), claiming that Benicorp wrongfully rescinded their health insurance coverage. This is before the Court on Benicorp's Motion for Summary Judgment (#67), filed October 3, 2005, which asserts that the Rowes omitted material information on their health insurance application and, under terms of the application, Benicorp had the authority to rescind their coverage as a matter of law.

## **FACTS**

The facts of this case are largely undisputed, although the parties differ widely in their

1

interpretation of those facts.[1]  As this is a motion for summary judgment, the Court will recite the facts in a manner most favorable to the non-moving party.  Plaintiff Jackie Rowe, an employee of S&R Anesthesia, applied for an employee-sponsored health and life insurance plan with the Defendant, Benicorp Insurance Company, on May 14, 2001.  This insurance plan covered his wife, Mary Rowe, and their children, Rebecca and Jeffrey Rowe.  The application asked several health questions, requiring that they be answered "thoroughly and truthfully for every person who will be covered."  ROW-AR 00137.[2]  The application further stated that "[a]ny misstatements or omissions of information may be basis for ... voiding coverage entirely." The applicable health questions read as follows:

> (1) Has any applicant within the last 5 years, been told by a medical practitioner that the applicant had, has or may have, any indication of any of the following conditions **OR** received treatment or medication; for any of the following conditions:
> * * *
> e. Diabetes, kidney, liver, male or female reproduction, or urinary tract disorders?
> * * *
> (2) Have any applicant(s), within the last 5 years, been counseled or advised to receive treatment or have surgery or seek hospitalization for any current medication condition?
>
> (3) Have any applicant(s) had medical or surgical consultation, advice, or treatment (including office visits or medication) for any conditions not listed during that past 36 months?

ROW-AR 00137.  Jackie Rowe responded in the negative to these three questions, and signed the

---

[1]The Rowes argue that two genuine issues of material fact remain.  They are incorrect. Whether Mrs. Rowe's omissions constitute misstatements is a question of law not fact.  And whether the alleged misstatements were innocent is immaterial, because no fraudulent intent or bad faith is required to constitute a material misstatement.  *See Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 903 (8th Cir. 2003).  Therefore this Motion is ripe for review.

[2]All citations to ROW-AR refer to the administrative record.

application.

In December of 2002 Mary Rowe was diagnosed with uterine prolapse and urinary incontinence. Before remedying her condition, Mrs. Rowe obtained pretreatment certification from Benicorp. This certification did not guarantee coverage or benefits, but did acknowledge that the surgery was medically necessary. Mrs. Rowe underwent a laparoscopic assisted vaginal hysterectomy to remove her uterus, a bilateral salpingo-oophorectomy to remove her ovaries and fallopian tubes, and to relieve her urinary incontinence she had an anterior and posterior colporrhaphy and a transvaginal tape urethropexy. ROW-AR 00259.

After the surgery, Benicorp requested additional information. In this letter, dated January 9, 2003, Benicorp asked Mrs. Rowe for details about her condition. Mrs. Rowe explained that she had symptoms of urinary incontinence for several years, but had never received treatment for it. Because a hysterectomy can aggravate this problem, her doctor recommended she undergo surgery to treat the incontinence. Benicorp asked if she had been treated for this condition in the past and whether she had been treated for any serious medical disorders in the past three years. Mrs. Rowe answered yes to both of these questions, stating that she had been treated for irregular and heavy vaginal bleeding, abdominal pain, and leg pain in the past. ROW-AR 00159-161.

Benicorp reviewed Mary Rowe's medical history and the underwriter, Terry Wrightsman, decided that if Benicorp had been aware of Mrs. Rowe's history of abnormal menses, a scheduled and

cancelled hysterectomy in 1997,[3] a planned hysteroscopy in April of 1999, and a discussed ablation in September of 2000, Benicorp would have charged S&R Anesthesia an additional $932.00 per month for coverage. ROW-AR 00383. Benicorp notified the Rowes that there were material omissions on their application for insurance, thereby voiding the Rowes' right to coverage. Benicorp rescinded the Rowes' policy as of the effective date, and refused to cover any medical expenses. ROW AR 00454-458. Mrs. Rowe sent a letter appealing the decision accompanied by a letter from her physician, but Benicorp affirmed its decision.

The medical history Benicorp refers to began in June of 1997. At that time Mary Rowe was seen by Dr. Jacob Pyeatte for her annual gynecological exam. She reported having heavy menstruation for ten days, followed by extended spotting, which was immediately followed by another heavy menstruation. Mrs. Rowe also complained of pelvic pain. Dr. Pyeatte ordered a pelvic ultrasound to rule out uterine or ovarian increase and ran some laboratory tests. ROW-AR 00209. Mrs. Rowe returned to her doctor to obtain the results from her exam on July 17, 1997. The ultrasound showed that her uterus had a normal configuration, but was somewhat larger than in November of 1994. Mrs. Rowe's ovaries were normal in appearance, and smaller than the previous study. All laboratory work came back normal, and the doctor found no abnormal fluid collections or cysts. ROW-AR 00213. While at Dr. Pyeatte's office, Mrs. Rowe reported that her menstruation was no longer painful and had become more normal. Dr. Pyeatte discussed conducting a

---

[3]It should be noted that the underwriter was under the incorrect belief that Mrs. Rowe had scheduled and cancelled a hysterectomy. ROW-AR 00383. Instead, Mrs. Rowe had scheduled and cancelled a hysteroscopy, which is an examination of the uterus, not its removal. ROW-AR 00215.

hysteroscopy, which is an examination of the inner cavity of the uterus through a fiberoptic tube, and a dilatation and curettage, a surgical procedure used to remedy abnormal uterine bleeding. Mrs. Rowe scheduled the procedures, but later cancelled them because she was "doing fine." ROW-AR 00215.

Mary Rowe returned to Dr. Pyeatte's office more than one year later, on December 30, 1998, for her annual gynecological exam. At the office visit, Mrs. Rowe reported that her menstrual cycle was still predictable, but that she was experiencing discomfort and some diarrhea at menses. The doctor's examination found her to be "fairly asymptomatic," but scheduled another pelvic ultrasound and some laboratory tests to ensure she was not anemic or suffering from hyperthyroidism. ROW-AR 00220. The ultrasound was performed on February 4, 1999. It revealed an abnormal thickened endometrial stripe and a simple cyst in her right ovary. ROW-AR 00225. Mrs. Rowe spoke to a nurse via telephone on February 23 and then again on April 30. The nurse explained that Mrs. Rowe should get either an endometrial biopsy or a hysteroscopy. Mrs. Rowe agreed to go forward with either procedure in the fall. ROW-AR 00224.

Mrs. Rowe saw her gynecologist again on July 7, 1999. At that time, she reported that her menses had improved. Dr. Pyeatte scheduled a repeat pelvic ultrasound "to be sure nothing [was] remarkable." ROW-AR 00227. The ultrasound revealed that Mrs. Rowe's endometrial stripe had reduced in size and was now within normal limits. No abnormalities were reported. ROW-AR 00229. Because tests were normal, "no further medical treatment was needed or recommended." ROW-AR 00468. In September of 2000, Mrs. Rowe saw Dr. Pyeatte for her annual gynecological

exam. At the exam, Mrs. Rowe described having a heavy menstrual flow and some very mild adnexal pain. Dr. Pyeatte discussed common procedures available to perimenopausal women, such as endometrial ablation, which is the surgical removal of the uterus lining, but did not formally recommend that she have the surgery. ROW-AR 00230 & 468. Another pelvic ultrasound was scheduled at this appointment. The results were normal. ROW-AR 00231.

This was Mrs. Rowe's last gynecological exam before her husband applied for insurance with Benicorp. In December of 2002 Dr. Pyeatte found polyps on Mrs. Rowe's cervix and became concerned that Mrs. Rowe might have adenomyosis, an abnormal thickening of the endometrial lining of the uterus. In addition, she was diagnosed with uterine prolapse, which is the displacement of the uterus from its normal position within the body, and stress urinary incontinence. Dr. Pyeatte scheduled the aforementioned surgery to remedy these issues. ROW-AR 00259 & 468.

After Benicorp rescinded the Rowes' policy and denied their appeal, the Rowes, along with two other Plaintiffs, filed suit against Benicorp in the Marion County Circuit Court. The Plaintiffs charged Benicorp with improperly rescinding their insurance coverage in violation of state and federal law. On April 7, 2004, Benicorp properly removed the case to federal court, because ERISA, 29 U.S.C. § 1001 *et seq.*, provides for federal jurisdiction. Benicorp filed a Motion for Summary Judgment on October 3, 2005. Responsive pleadings have been filed and the motion is ripe for review.

**DISCUSSION**

## I. Summary Judgment Standard

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed. R. Civ. P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 467, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow the Court to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In passing on a motion for summary judgment, the Court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to its analysis.

## II. Standard of Review

In examining a wrongful denial of benefits claim, the Court must first determine which standard of review is appropriate. Generally, when a plan is governed by ERISA and grants the administrator discretionary authority to determine eligibility for benefits and to interpret policy terms, an abuse of discretion standard is appropriate. *Firestone Tire & Rubber Co. v. Brusch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989); *Barnhart v. Unum Life Ins. Co. of Am.* 179 F.3d 583, 587 (8th Cir. 1999). It is undisputed that Benicorp's policy is governed by ERISA and grants the administrator such discretion.

However, this standard is not applicable if the Plaintiff can demonstrate that either a conflict of interest or a serious procedural irregularity existed, and that this conflict or irregularity caused a "serious breach" of the plan administrator's fiduciary duty. *Buttram v. Cent. States, S.E. & S.W. Areas Health & Welfare Fund*, 76 F.3d 896, 899-900 (8th Cir. 1996); *Barnhart*, 179 F.3d at 587. If a plaintiff can satisfy this "two-part gateway requirement," the Court uses a "'sliding-scale'

approach," reducing the deference given to the administrator in an amount commensurate with the severity of the conflict or irregularity. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). The Rowes argue that both a palpable conflict of interest and serious procedural irregularities existed that caused Benicorp to breach its fiduciary duty.

The Court will first examine whether Benicorp had a palpable conflict of interest. Where, as in this case, the insurer also acts as the plan administrator, the Eighth Circuit recognizes "something akin to a rebuttable presumption of a palpable conflict of interest." *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 947-48 (8th Cir. 2000). Although it is improper for the Court to automatically assume the existence of a conflict, a defendant must articulate "ameliorating circumstances" to overcome the presumption. *Id.* at 94. Benicorp cannot deny that its decision to rescind the Rowes' policy benefitted the company financially, as the rescission saved Benicorp approximately $42,000 in medical bills. To overcome this presumption, Benicorp argues that an underwriter's performance is not evaluated based on the profitability of policies and that Benicorp does not instigate investigations based on the dollar value of the claim. Instead, Benicorp investigates claims based on factors such as the seriousness of the condition and whether the condition is chronic in nature. Because a serious or chronic condition generally constitutes a more expensive condition, Benicorp's distinction is illusory. The Court finds that Benicorp was functioning under a "palpable conflict of interest" when it rescinded the Rowes' policy, thereby satisfying the first part of the two-part gateway test.

For the next inquiry, the Court must determine whether the Rowes set forth "material,

probative evidence" showing that the conflict caused a serious breach of Benicorp's fiduciary duty. *Schatz*, 220 F.3d at 948. This evidence must be sufficient to "give rise to 'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" *Id.* (quoting *Layes v. Mead Corp.*, 132 F.3d 1246, 1250 (8th Cir. 1998)). The Rowes have offered no additional evidence on point. Therefore, they did not establish that Benicorp's conflict of interest caused a breach of fiduciary duty.

The Rowes next argue that serious procedural irregularities existed, thereby entitling Benicorp to a less deferential standard of review. They argue that Benicorp misapplied or failed to apply its own standard to determine if a statement was material, that the insurance investigator had no formal medical training and never consulted with available physicians, and that Benicorp treated annual exams, medical tests with normal results, and pre-menopausal occurrences as conditions that required disclosure. The Court found an additional irregularity; the underwriter was under the mistaken belief that Mrs. Rowe had scheduled and cancelled a hysterectomy in 1997 – the same procedure that was ultimately performed in 2002. In actuality, Mrs. Rowe had scheduled a less serious procedure, a hysteroscopy, which involves an internal examination of the uterus, not its removal.

These instances are not sufficient to constitute a serious procedural irregularity. Both the insurance policy and the application gave Benicorp the right to rescind a policy for a material misstatement. Benicorp found the Rowes' omissions to be material because, given the additional risk, Benicorp would have increased the rates charged to S&R Anesthesia by $932 per month. A determination of materiality by calculating a premium increase is consistent with Benicorp policy and

Eighth Circuit caselaw. *See Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 905 (8th Cir. 2003). Therefore, this is not an irregular business practice. The Rowes' remaining arguments are not examples of procedural irregularities. Instead, they are arguments as to why Benicorp's interpretation of the facts was unreasonable. The only true procedural irregularity is the one noted by the Court, that Benicorp's underwriter incorrectly believed Mrs. Rowe had scheduled and cancelled a hysterectomy in 1997. But this irregularity is not sufficient to trigger a less deferential standard of review. Therefore, the Rowes have not satisfied the gateway test.[4] The Court will examine Benicorp's decision under an abuse of discretion standard.

### III. Rescission of Health Insurance: Abuse of Discretion Review

Under an abuse of discretion standard, a court will uphold the administrator's decision to rescind an insurance contract if its decision was "reasonable." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004); *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 797 (8th Cir. 2002); *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002); *Delta*

---

[4]Even if this could constitute a serious procedural irregularity, the Rowes have not established the second gateway requirement – that the irregularity caused a breach of Benicorp's fiduciary duty. This requirement "presents a considerable hurdle" to a plaintiff. *Barnhart*, 179 F.3d at 588 n. 9. The difficulties faced by a plaintiff are so significant that only two Eighth Circuit cases found a plaintiff to have met that burden: *Morgan v. Contractors, Laborers, Teamsters & Eng'rs Pension Plan*, 287 F.3d 716 (8th Cir. 2002) and *Harden v. Am. Express Fin. Corp.*, 384 F.3d 498 (8th Cir. 2004). *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670 (8th Cir. 2005). In *Morgan*, the court determined that withholding significant information from the claimant before an appeal hearing was a procedural irregularity that caused a serious breach of trust. And in *Harden*, the court found that a defendant's failure to obtain Social Security records for the administrative record after promising to do so, and basing a decision on a record without such information, was a breach. The Rowes' situation is not comparable to that of *Morgan* or *Harden*.

11

*Family-Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 841 (8th Cir. 2001). A plan administrator's decision is considered to be "reasonable" if it is supported by substantial evidence "which is more than a scintilla, but less than a preponderance." *Ferrari*, 278 F.3d at 807 (quoting *Woo*, 144 F.3d at 1162). *See also McGee*, 360 F.3d at 924; *Coker*, 281 F.3d at 797; *Delta Family-Care*, 258 F.3d at 841. "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McGee*, 360 F.3d at 924 (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). A court must affirm a plan administrator's decision to rescind if a "reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Ferrari*, 278 F.3d at 807 (quoting *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997)). Even if a different, reasonable decision could have been made, the plan administrator's decision must be affirmed. *McGee*, 360 F.3d at 924; *Cash*, 107 F.3d at 641.

When reviewing the plan administrator's decision under the abuse of discretion standard, a court can only consider the evidence that was before the plan administrator when the claim was denied. *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 642 (8th Cir. 2002); *Farley v. Arkansas Blue Cross & Blue Shield*, 147 F.3d 774, 777 (8th Cir. 1998). Furthermore, the reviewing court cannot substitute its own weighing of the evidence for that of the plan administrator. *Farley*, 147 F.3d at 777; *Cash*, 107 F.3d at 641.

The Eighth Circuit "allows for the equitable rescission of an ERISA-governed insurance policy that is procured through the material misstatements or omissions of the insured." *Shipley*, 333

F.3d at 902. The misrepresentation or omission must be made knowingly, but the insured need not have any fraudulent intent or bad faith. A knowing but innocent misrepresentation or omission, if material, is sufficient to give an insurer cause to rescind. *Id.* at 903. Therefore, the Court must determine whether a reasonable person could have found that the Rowes knowingly omitted material information.

"A misrepresentation is a statement of fact that is untrue or a failure to disclose a fact in response to a specific question." *Id.* at 904. Benicorp alleges that the Rowes made three misrepresentations in their responses on the application. When asked if the applicant was told by a medical practitioner that she suffered from, had any indication of, or received treatment or medication for a female reproductive disorder or a urinary tract disorder within the past five years, the Rowes replied: No. When asked if the applicant was counseled or advised to receive treatment or have surgery for a current medical condition within the past five years, the Rowes replied: No. And when asked if the applicant had medical or surgical consultation, advise, or treatment for any other conditions within the past three years, the Rowes replied: No.

Using hindsight, it is clear that Mrs. Rowe's abnormal menses, abdominal pain, and thickened endometrial stripe were the precursors to her ultimate problem – uterine prolapse. But the question is whether Benicorp could reasonably have believed that Mrs. Rowe: (1) was told by a medical practitioner that she may have a reproductive or urinary tract disorder; (2) knew she was suffering from a "current condition" on May 14, 2001, the date of application, and was advised to seek treatment for such a condition; or (3) received medical or surgical advice for any other known

13

condition.

Outside of Mrs. Rowe's medical records, there were two items in the administrative record evidencing Mrs. Rowe's knowledge. In an appeal letter sent by Mrs. Rowe, she stated:

> Not at any time while under Dr. Pyeatte's care was I informed of any condition outside the range of "normal" before applying for coverage with your company. Any and all procedures were diagnostic in scope and all came back within normal limits. ... At one time I had an enlarged uterus but a repeat test showed the uterus within normal limits. At one point I did have a test, which took a sample of the inside of my uterus, and it too came back within normal limits. Further tests were discussed **IF** and **ONLY IF** there was a medical need for more testing. The symptoms did improve and no further medical treatment was needed or recommended. None of the procedures I had were for a diagnosed condition; they were only tests used for diagnostic purposes. Each diagnostic test resulted in normal findings. Since all of the tests I had came back normal, I did not consider myself having a reproductive medical condition or disorder. Dr. Pyeatte never at any time, before applying for coverage, informed me that I had a medical condition or disorder.
>
> Dr. Pyeatte did inform me about procedures that are common to many women my age including endometrial ablation but he did not tell me he recommended any of these procedures for me at that time. When Dr. Pyeatte discussed these options with me it was not in terms of recommendations but rather informative information about common procedures available. I was reluctant to even discuss these procedures with him because I hoped to be able to proceed normally into my menopausal years without such procedures.
>
> In the fall of 2002 Dr. Pyeatte found polyps on my cervix. This was a major concern to him and to me. At this time he also indicated that I might have adenomyosis. This was the first time I had been diagnosed with a medical reproductive disorder and another possible medical condition or disorder. The surgery was scheduled for these two conditions.

ROW-AR 00468. In addition, Benicorp was given a letter from Dr. Pyeatte. When reviewing the evidentiary record, neither the reviewing court nor the plan administrator are obligated to accord special deference to the opinion of the treating physician over the opinion of the reviewing physician. *McGee*, 360 F.3d at 925. But here, where the plan administrator obtained no outside medical

14

opinions, the sole medical opinion receives a significant amount of weight. This letter stated:

> I certainly agree with the assessment regarding worsening gynecologic problems more recently. We had Mary on conservative management years previously and, in fact, her symptoms had improved. Symtomatology actually broke through and worsened in the past six month to a year prior to her surgery. I think this should certainly come under a change more recently.

ROW-AR 00469.

The Court does not find substantial evidence in Mrs. Rowe's medical records to show that abnormal menses, scheduled hysteroscopies, and a discussed ablation were abnormal for a woman proceeding through her perimenopausal years. Therefore, there is no evidence that Mrs. Rowe "had been told by a medical practitioner that [she] had, has or may have any indication of ... or received treatment or medication for" a female reproduction disorder. ROW-AR 00137. As stated by Mrs. Rowe's physician, symptoms of her condition did not "break through" until after she had applied for insurance with Benicorp. Benicorp has not shown that a reasonable person could have found that Mrs. Rowe omitted pertinent information in response to this question.

There is also no evidence that Mrs. Rowe "had been told by a medical practitioner that [she] had, has or may have any indication of ... or received treatment or medication for" urinary incontinence. Urinary incontinence first appeared in Mrs. Rowe's medical files in December of 2002. Therefore, the condition was not treated, counseled, or discussed with a medical professional until after Mrs. Rowe applied for insurance with Benicorp. A reasonable person could not have found that Mrs. Rowe made an omission in response to this question.

15

Further, Mrs. Rowe did not make a misstatement in response to the second question: whether she had "been counseled or advised to receive treatment or have surgery or seek hospitalization for any current medical condition." ROW-AR 00137. When Mrs. Rowe applied for insurance, she had not seen her gynecologist for approximately eight months, and all tests performed at her previous appointment had been normal. Benicorp had the burden of showing that a reasonable person could have found that Mrs. Rowe was suffering from a current medical condition. It has not met this burden.

Finally, Mrs. Rowe did not make a misstatement in response to the third question: whether she "had medical or surgical consultation, advice, or treatment (including office visits or medication) for any conditions not listed during that past 36 months." ROW-AR 00137. It is clear from the evidence that Mrs. Rowe did not know, nor should she have known, that she suffered from a condition. Mrs. Rowe could not have received medical or surgical advice for an unknown condition. According to the evidence, all medical advice Mrs. Rowe received surrounded her progression into menopause. Menopause and its effect on the body is not a condition. It is a stage in a woman's life. Benicorp has not shown that a reasonable person, reading Mrs. Rowe's medical record, her letter, and Dr. Pyeatte's letter, could have come to the conclusion that Mrs. Rowe had knowledge of any condition.

The evidence does not support Benicorp's determination. The only medical opinion in the record confirmed that Mrs. Rowe's gynecological abnormalities did not become sufficiently symptomatic to put her physicians on notice until after the Rowes applied for insurance. Without

additional medical evidence showing that Mrs. Rowe's symptoms and diagnostic tests were abnormal for a perimenopausal woman, Benicorp's findings were unsubstantiated. Benicorp has not produced sufficient evidence to show that it is entitled to a judgment in its favor.

**CONCLUSION**

There was not substantial evidence to support a finding that Mrs. Rowe knowingly omitted material information on her application. Therefore, a reasonable person could not have come to this conclusion. Benicorp has not shown that its decision could withstand an arbitrary and capricious review. The Defendant's Motion for Summary Judgment (#67), is denied.

Dated this 1st day of February, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE